Lee A. Hess, Esq. (SBN 76764)
Alejandro H. Herrera, Esq. (SBN 284712)
**HESS, HESS & HERRERA, P.C.**
233 Wilshire Blvd., Suite 400
Santa Monica, CA 90401
Tel:   213-545-1660
Fax:   213-232-7555
lee@hessherrera.com
alex@hessherrera.com

Attorneys for Plaintiff,
PRAVEEN SINGH and
JOYTESHNA KARAN

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRAVEEN SINGH, an individual, and JOYTESHNA KARAN, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> KIRK BUNCH, an individual, FRANK NAVARRO, an individual, JOHN EVERS, an individual, DAVID HARRIS, BIRGIT FLADAGER, THE COUNTY OF STANISLAUS, a government entity, ADAM CHRISTIANSON, STANISLAUS COUNTY SHERIFF DEPARTMENT, a government entity, and DOES 1 – 100, inclusive, <br><br> Defendant(s). | Case No:  1:15−CV−00646−TLN−BAM <br><br> COMPLAINT FOR: <br><br> 1) VIOLATIONS OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983; <br> 2) CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY (18 U.S.C. 1961, et seq. & 18 U.S.C. 1964 (Civil RICO)); <br> 3) DEFAMATION PER SE <br> 4) TORTIOUS INTERFERENCE WITH CONTRACT; <br> 5) NEGLIGENT INTERFERENCE WITH CONTRACT; <br> 6) TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE; <br> 7) NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE; <br> 8) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; <br> 9) NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; <br><br> DEMAND FOR JURY TRIAL |

/ / /

/ / /

/ / /

# I.

## PARTIES

**A. PLAINTIFFS:**

1. Plaintiff, PRAVEEN SINGH, a California individual, was at all times mentioned herein, a resident of the City of Modesto, County of Stanislaus, State of California (hereinafter referred to as "<u>SINGH</u>" or "<u>Plaintiffs</u>").

2. Plaintiff, JOYTESHNA KARAN, a California individual, was at all times mentioned herein, a resident of the City of Modesto, County of Stanislaus, State of California (hereinafter referred to as "<u>KARAN</u>" or "<u>Plaintiffs</u>").

**B. DEFENDANTS:**

3. Defendant Stanislaus County, and the Stanislaus County Office of the District Attorney are sued for the acts of their respective employees and agencies.

4. Defendant, Birgit Fladager ("<u>FLADAGER</u>"), at all times relevant hereto, was a resident of the State of California, County of Stanislaus and was acting under color of law in her capacity as District Attorney for the Stanislaus County Office of the District Attorney. As the head of the Stanislaus County District Attorney's office, Fladager both exercised and delegated her final decision making power to the internal and external affairs of her office. On information and belief, she has also trained and supervised the specific investigators named herein.

5. Defendant, David Harris ("<u>HARRIS</u>"), at all times relevant hereto, was a resident of the State of California, County of Sacramento, and was acting under color of law in his capacity as Chief Deputy District Attorney for the Stanislaus County Office of the District Attorney. Harris is sued in his individual and official capacity. As the head of the Stanislaus County District Attorney's office investigators and special units, Harris both exercised and delegated his final decision making power to the internal and external affairs of the office. On information and belief, he has also trained and supervised the investigators named herein, and is responsible for the actions of the investigators and officers named herein.

6.     The County Sheriff Department ("SHERIFF") is responsible for the actions of the Stanislaus County deputy sheriffs.

7.     Doe Sheriff #1 and Doe Sheriff #2 are sued as individuals and in their official capacity as deputies of the Stanislaus County Sheriff Department.

8.     At all times relevant hereto, Defendant KIRK BUNCH was a resident of the State of California, County of Stanislaus and was acting under color of law in his capacity as investigator for the Stanislaus County Office of the District Attorney, employed by the Stanislaus County Office of the District Attorney. Defendant Bunch is a lead investigator on a task force composed of officers and investigators from the Modesto, Turlock, and Ceres police departments; the Stanislaus County Sherriff's Department; and the Stanislaus County Office of the District Attorney. Although Defendant BUNCH has alleged he works under the auspices of other State and Federal agencies, there is no evidence to suggest as much. Since beginning his employment with the Stanislaus County District Attorney's office, Bunch has been accused numerous times of misconduct, fraud, and related corruption. Based on information and believe, Defendant Bunch's misconduct and corruption is under investigation by the Federal Bureau of Investigation. On information and belief, the FBI investigation of Bunch is related to the facts and circumstances herein. Defendant Bunch, in his official capacity as a criminal investigator for the Stanislaus County Office of the District Attorney and lead investigator of the aforementioned task force, is a municipal official whose acts constitute official policy for the County of Stanislaus. Specifically, Defendant Bunch's orders had the effect of setting a particular course of action in which Defendants followed his orders and Plaintiffs were harmed.

9.     At all times relevant hereto, Defendant FRANK NAVARRO was a resident of the State of California, and was acting under color of law in his capacity as investigator for the Turlock Police Department.

/ / /

JS District Court
Eastern District
Civil

10. At all times relevant hereto, Defendant JOHN EVERS was a resident of the State of California, and was acting under color of law. Defendant Evers is, and at all times mentioned herein was, a detective with the City of Modesto Police Department. In that capacity, Evers was responsible for the actions of the police officers who accompanied him during his investigations. He is sued in his individual and official capacities.

11. Defendants Bunch, Navarro, and Evers are hereinafter collectively referred to as the "Investigators."

## II.

## JURISDICTION AND VENUE

12. This action is being brought in part pursuant to the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 42 U.S.C. § 1988. The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

13. All of the Defendants' actions as set forth below having taken place within Stanislaus County, California, and the majority of the Defendants' principal places of business being within the same County, the venue of this action in the Southern Division of the Eastern District of California, within which Stanislaus County, California is contained, is lawful pursuant to 28 United States Code Sec. 1391.

## III.

## FACTS

14. Since early 2013, Plaintiff PRAVEEN SINGH has been the subject of an erroneous and malicious investigation related to the homicide of Korey Kauffman. Plaintiff Singh has no criminal record, and an extensive background in law enforcement education and professional investigative services.

15.     The investigation was led by the office of the District Attorney, Defendant Fladager, headed by her Chief Deputy District Attorney Defendant Harris and investigator and Defendant Bunch. Since having started this investigation, investigators have been abusing their power, arresting Singh on three different occasions, none of which relate to the homicide investigation.

16.     While the investigation into the murder of Mr. Kauffman appeared to have been solved[1], investigators have kept the investigation "open", alleging that Frank Carson, a local attorney who has used Singh as a private investigator and represented Singh in other matters, was involved in the death of Mr. Kauffman.[2]

17.     It appears the motivation behind this investigation and related investigations is politically and racially motivated, or possibly another personal vendetta by Defendants. Indeed, this and the related investigations involve other members of the Indian community, and the same non-Indian Defendants. The District Attorney's office has been privy to Frank Carson's intent to run in an election for the office of District Attorney (where Mr. Carson was literally seeking to take Ms. Fladager's job), and as the election got closer, the Investigators became more aggressive towards Mr. Singh (and Mr. Carson), pressuring him more and more to "*turn over Carson*," or give them "*something on Carson*." Critical to the election was the vote of the Indian community, making up a substantial vote, who Mr. Carson was closely connected to and had support from.

18.     At the time this action was first filed, investigators had discovered no evidence to link the two to the murder (and evidence offered as of the time of this amended pleading is highly questionable), and instead have intruded on the business

---

[1] Law enforcement has since then arrested and charged Robert Lee Woody with the murder of Korey Kauffman. Furthermore, a new development has arisen as to another suspect whom Plaintiffs have zero association with. Furthermore, Investigators have offered no explanation as to Singh's involvement into the death of Kauffman.

[2] Frank Frank Carson and eight others, including three California Highway Patrol officers, were arrested August 14, 2015 for their suspected involvement in the 2012 death of Korey Kauffman. A 326-page arrest affidavit detailing the alleged conspiracy makes virtually no reference to Singh.

and personal life of Singh, maintaining he is "*a person of interest*", all while ruining his reputation, threatening his family, and deliberately and tortuously interfering with his business and ability to provide for his family. In fact, even the close family circle and friends of Singh, including Plaintiff Joyteshna Karan, Singh's girlfriend who is also the mother of his two children, have been "*investigated*", harmed, and bullied by the District Attorney's office, Bunch, and Defendants. The District Attorney's Investigators have engaged in an all-out bully campaign against Singh and the "Indian" community[3] under the color of law, and they don't appear to have any intention of stopping. To date, Defendants have investigated and harassed over 100 members of the Indian community.

19.     In March of 2012, Korey Kauffman disappeared after leaving a friend's house. Investigators from the Turlock, Modesto and Ceres Police Departments, Department of Corrections, and the Stanislaus County Sheriff's Department were involved in a joint task force investigating the crime(s). At some point during this investigation, Defendants and Defendant Bunch came to believe that Singh was involved in the murder, though such belief was driven by Defendants malicious and predisposed view of the Indian community.

20.     In mid 2013, Singh was contacted by Bunch, who asked Singh to come to the District Attorney's office to "talk." They met in the hallways of the District Attorney's office rather than an office. Singh then learned that Bunch discovered that Singh (during an investigatory interview of an inmate) may have obtained information that could have solved a crime being investigated by Bunch. Bunch was unable to solve the crime or find the evidence he needed, and aggressively requated

_____

[3] As part of the "investigation" into Mr. Kauffman's murder, investigators also searched the business and residence of Balgit Singh Athwal, who they allege "knew" where the body was. When the Athwal's didn't give investigators what they wanted, they engaged in similar behavior herein alleged by Singh. The Athwal's home and business were searched, and investigators destroyed bottles of liquor, wine and beer, broke down doors, put guns to their head while making threats, and even bribed them to "confess" to their involvement in the crime. Another lawsuit has been filed in connection to these events in this same Eastern District of California (Case No. 1:15-cv-00311-TLN-BAM)

that Singh disclose the information he received during this jailhouse interview. Singh, however, informed Bunch that this information was not his to disclose because it was part of an investigation and privileged. Singh was performing investigative services for Mr. Carson, who was representing said inmate. Bunch angrily shifted the subject when Singh refused to disclose the privileged information and stated, "Big Daddy is going to through you under the bus, so you should help yourself and your family." Bunch was *extremely* angry, turned red in the face, eyes bulging, making comments such as, "are you sure you want to go to prison… I'll make sure you never see the daylight." While having this outburst, Bunch placed his left hand on his hip, and right hand on his firearm, angling the firearm side of his body towards Singh. Although Singh was in fear of and apprehensive, he immediately stepped around Bunch and left the building to avoid further confrontation.

21.     After this incident, Bunch was spotted almost daily by Plaintiffs Singh Karan sitting alone in a dark sedan looking through binoculars (at times he was seen with with Evers or Navarro as well, and/or in a silver sedan).

22.     Between September 6 - 9, 2013, Singh was on a family vacation with his family. While Singh was on vacation, Amel Mohammed Attalla[4] made erroneous allegations about Singh to Bunch. Amel Mohammed Attalla is a confidential witness hired by Bunch, and brother of Haythem Michael Attalla, also a confidential informant. Amel Attalla called Singh prior to leaving for vacation, and informed him that he was being investigated for the murder of Korey Kauffman. Singh maintained his innocence during his conversation with Amel Attalla, reassuring Amel Attalla that he has no involvement with Mr. Kauffman, and certainly no involvement with a murder. Amel Attalla attempted to induce Singh to "talk" about

_____

[4] Amel Attalla and Michael Attalla are two former Modesto vehicle dealers who know Mr. Singh because Mr. Singh also holds a vehicle dealer license.

the murder, had a recording device, asked Singh if he knows anything, and that Singh should "*tell the truth about Carson*," and that "*Carson is going down*" and Singh "*will go down with him*, [unless Singh] *talks*." Although Singh had nothing to offer the investigation, he offered himself, and has, in fact, cooperated with Investigators.

23.     On October 2, 2013, Singh was asked to sit for a Polygraph examination regarding this murder investigation. Because of his decided cooperation and steadfast belief in his innocence, Singh agreed to sit for the six hour-long examination. Questioning involved every aspect of the investigation into the death of Mr. Kauffman, and Singh's alleged participation in the crime. During the examination, Investigators turned aggressive and against Singh when he was questioned, and then accused of "*transporting the body in the van*" when he allegedly answered a question related to this topic "wrong". Although the "van" in question is allegedly important to the investigation, Investigators took <u>no</u> steps to preserve the evidence (the "van"), and allowed the van to be sold at auction. Since the Polygraph examination, Singh has repeatedly requested the transcript and results of the examination be provided to him. However, no transcript has been provided to Singh. Of note, as of the time of this filing, Singh is believed to be the only individual in this investigation who has sat for a Polygraph exam.

24.     Soon after the Polygraph examination, Investigators began their attack on the friends and family of Singh. This is a pattern Bunch consistently follows, wherein he would threaten the friends and family of Singh, together with an accusation that Singh, "*is a murderer*" and that Singh runs some sort of a prostitution ring. Indeed, Bunch and the Investigators have stated such to Karan and other friends and family of Singh.

25.     On numerous occasions, Karan and Singh's friends were threatened by Investigators to "*get away from Singh*" because "*he is a murderer*" and "*a pimp*." Some of Plaintiffs friends have actually stayed away and shunned Singh in fear of

retaliation from Investigators. Defendants knew the Indian community is sensitive about these types of allegations, and used it against Plaintiffs.

26. On or about September 13, 2013, Karan, together with a friend, and after being "asked" to do so by Bunch, voluntarily went to the District Attorney's office to "talk" about the investigation. Karan's friend came along after Bunch stated to him, "*bring her in and I will not pursue her*." Although Karan was cooperating with Investigators, answering their questions truthfully, Investigators threatened Karan with an investigation for real estate fraud if she didn't "*give them what they wanted*."

27. There was no basis for an investigation for real estate fraud whatsoever. What they wanted was information incriminating Singh, and if they couldn't get information, then she was to "leave" Singh. Bunch stated, "*If you don't leave him, them I am going to investigate you for real estate fraud*." At this time, Singh and Karan were the parents of one child, and Karan was pregnant with a second child, due December 2, 2013, making her about 5 months pregnant at the time. Bunch went on to say, "*If you don't stay away* [from Singh]*, I will come and take your kids away and put them in foster care*." "*Tell us that Frank Carson committed the murder and I'll throw everything away*." "*I don't care about real estate…*" But, "*…I will make it happen*" if he doesn't "*talk*". "*I will investigate you and take your children away*." Bunch said this in the presence of the other Investigators. Bunch said this with a complete disregard of her delicate state of pregnancy.

28. On October 16, 2013, a body was found in the Stanislaus National Forest and soon thereafter determined to be that of Korey Kauffman.

29. **On October 29, 2013, not more than two weeks after Kauffman's body was found, Singh was mysteriously arrested**, although he learned it was not regarding the murder investigation. While driving away from his office, Singh was pulled over by Bunch and Evers (in one car), and another DA Investigator [Lingerfelt] (in a second car). Bunch approached Singh while still in his vehicle and

asked him to step out of the vehicle. Singh fully cooperated, then was asked by Bunch to turn around and put his hands behind his back. Bunch then handcuffed Singh and placed him under "arrest." Bunch, nor any other officer present read Singh his *Miranda* rights, nor informed him of the reason for the arrest, nor provided Singh any information about this arrest whatsoever. Singh did ask why he was being handcuffed, to which Bunch told him that he "would explain later… hang tight." Singh was then taken to the District Attorney's office for questioning, none of which questioning had any known connection to the underlying arrest. Singh was confused and noted the felony-style arrest.

30. Bunch and Evers interrogated Singh for roughly two hours about the Kauffman murder, but no questioning about the actual underlying violation. Bunch and Evers both conducted the two hours of questioning. Other personnel at the DA's office were present and witnessed Singh's questioning.

31. Apparently, Singh was arrested for violation of California *Insurance Code* §1814. Notably, only 1 person has ever been arrested for violation of this provision in the history of the law. Nor was the underlying violation a felony warranting a felony-style arrest. During the end of his "arrest" Mr. Singh was permitted to briefly meet with Karan (at the DA's office) to allow him to turn over his personal effects to her before being booked and jailed. At this time, Bunch said to Karan, with Singh and Singh's mother present, "*This is the start, now it's all coming down the tube, and people are going to start getting arrested…*" Bunch was referring to the murder investigation again, and made no reference to the actual "crime" for which Singh was being arrested.

32. After Singh was jailed, his bail bond was posted at about 10:00 PM the same day, but wasn't released by Sheriffs until about 4:00 AM, 6 hours later. However, after having already posted bail (and verifying to jailhouse Sheriff personnel that it was in fact posted) [See jail house recordings], rather than being released, Singh was forced to change into jailhouse cloths, and not released. Instead, he was transferred into the

facility that was holding members of the Northern Ryders gang (Second floor, south tier, of the downtown Modesto holding facility). Bunch has previously accused Singh of hiring Northern Ryders gang members to do his "dirty work[5]", and attempted to "set up" Singh with these gang members by listening in on conversations while in custody. Singh specifically informed Doe Sheriff #1 of the issues and danger of being put into a cell or area with Northern Ryders, including that he was an "investigator," Doe Sheriff #1 responded by stating to Singh, "That's your [Singh's] problem."

33.     After several hours, and no evidence, Singh was finally released.

34.     In or around November 11, 2013, Frank Carson, a prominent Modesto criminal defense attorney officially announced his intent to run for the office of the District Attorney. Singh has worked as a private investigator for Mr. Carson. Almost immediately after this announcement, Mr. Carson's office was mysteriously burglarized, although nothing of any value was stolen. On a similar note, Singh was informed by his friends that Bunch was stepping up his investigation into the murder of Mr. Kauffman. In response to this news, Singh voluntarily called Bunch and asked him, "*What do you want from me?*" Bunch replied, "*If you don't bring me the murder weapon, I'm going to arrest you.*" "*You know what it is,… go bring it, and I won't arrest you.*" Bunch gave Singh a two-week deadline to bring this information.

35.     **On November 27, 2013, the evening before the Thanksgiving holiday, consistent with the threat and 2-week deadline given by Bunch, Singh was arrested <u>again</u>**, but this time for an alleged solicitation to commit a drive-by shooting/robbery (and related crimes) against his neighbor, not for the homicide of Mr. Kauffman.

36.     Prior to this arrest, investigators informed Singh and his counsel that they intended to prosecute Singh for this "new" crime.

---

[5] Bunch has accused Singh of using Northern Ryder gang members to carry out crimes in exchange for information on other criminals. Bunch has also accused Singh of adding money to the books of inmates who referred people to Singh's bailbond business. Notably, Singh has never added money to the books of any inmate.

US District Court
Eastern District
Civil

37.     Singh informed investigators (and Bunch on one prior occasion) that he was expecting a newborn on December 2, 2013, and if they intended to arrest him, to do it after the birth. However, this did not happen.

38.     Instead, Bunch and the Investigators saw an opportunity to cause more harm and bring more pressure on Singh by arresting him with the hope that he would take a deal under the stress of wanting to see the birth of his new child.

39.     Not only did Singh get arrested the day before the Thanksgiving holiday, and 4 days before the birth of his second child, but after his arrest, Investigators sought and placed Singh under a §1275 hold. Singh spent the entire Thanksgiving Day holiday weekend in jail because of the §1275 hold. In addition to this hold, the courts were closed through the weekend, further frustrating Singh's ability to witness the birth of his next child. Singh never saw the birth of his child.

40.     The timing of this arrest took a serious toll on Singh and Karan. Singh asked Bunch what the §1275 hold was for, and Bunch said, "*all your businesses are fraud.*" "*You are a danger to society and a danger to yourself.*"

41.     When Singh was finally moved by Doe Sheriff #2 from his holding cell into a more permanent cell (south tier, second floor), he was again moved into the portion of the facility housing members of the Northern Ryders gang. Singh had previously bailed out two members of the gang, so the gang members were familiar with Singh. Because the gang members were currently being "worked over" (scrutinized) by Bunch, Bunch saw and took advantage of this situation by intentionally misinforming gang members and jailhouse personnel about Singh. During the booking process, Singh specifically informed Bunch, Evers, and Doe Sheriff #2 of the issues and danger of being put into a cell or area with Northern Ryders (again), including that he was an "investigator." Doe Sheriff #2 responded by stating to Singh, "You're going to go where we put you. You don't have a choice." Indeed, Bunch, in the presence of Singh and others, informed Doe Sheriff #2 that Singh was an affiliate of the Northern Ryders.

42.    Bunch and Evers stood over Singh and forced him to sign the booking sheet, even after Singh again protested and informed Bunch, Evers and Doe Sheriff #2 of the danger. Singh was then placed in a holding cell, then transferred to the cell area where Northern Ryders were also held.

43.    Singh was in fact confronted, and a neighboring inmate told Singh's cellmate that Singh is a snitch and to "smash him". After being punched in the face, Singh immediately yelled for a guard. Singh was punched 3 to 4 times (in the head) before a guard arrived. Said guard, who was familiar with Singh asked him why he was in this particular area of the jail, since this area was reserved for dangerous members of the Northern Ryders gang. The deputy was shocked that Singh ended up in this area of the jail, and moved Singh into a laundry facility in order to get Singh out of danger. Singh was ultimately moved to a new facility.

44.    Prior to being transferred, Karan added money to Singh's books, but Sheriff personnel intentionally refused to provide Singh with access to this money.

45.    After Singh was finally released, a gang member told Singh that it was Bunch who told them that Singh was a "snitch" and had them doing "dirty work" for Singh. Bunch actually said the same thing to Karan, which was consistent with what the gang members said to Singh. Because of this accusation by Bunch, several members threatened Singh with his life. Bunch has also accused Singh of, "*adding money to the gang members books*," which is not true. Prior to this latest arrest, Singh had never added any money to any gang member's account.

46.    An initial bail hearing was held on December 2, 2013, but postponed until the next day. Interestingly, the Investigators were all present at this hearing, which is not normal, and was likely for the purpose of intimidating Singh. After Singh's hearing, they all left the courtroom.

47.    On December 2, 2013, the same day, Karan delivered her child. Because of the stress caused by Singh's arrest over the Thanksgiving holiday, and on the eve of Karan's due date, Karan's placenta was torn, and she was forced to

rush to the hospital. A C-section was required immediately because of the torn placenta. The birth had complications due to the stress suffered by Karan, from Singh being in jail for murder, together with the threats by Bunch.

48.     Singh's bail hearing was finally heard on Tuesday, December 3, 2013, the day after the birth of his second child. After the hearing, and after bail was posted, Singh was not "processed" until about 9 PM. This took, literally, all day and night to "process." Singh was finally released at about 4 AM the next morning.

49.     On this same day, December 3, 2013, on information and belief, Singh is named as a person of interest in the Kauffman murder investigation.

50.     **On February 27, 2014, around 8:30 AM, Singh was arrested for a third time**, this time for violation of Welfare and Institutions Code §14107(b)(4)(a) ("Welfare Fraud"). This arrest occurred at the office of Karan's real estate brokerage, Royal Realty. However, prior to his arrest, Singh stopped at the office of Royal Realty, and while he was already on the road driving away from Royal Realty, was pulled over, and asked by Bunch for the keys to Royal Realty's office. Singh, being cooperative as he always has been, handed them to Bunch, who returned to the Royal Realty office with Investigators.

51.     Investigators spent the entire day searching the office, its files, computers, and ended up seizing the majority of the company's real estate document files, computers, and printers. Also seized were cell phones belonging to Singh, and other tech devises (e.g. gps). After the investigators daylong search and seizure of a real estate business, Singh was taken to the Investigators office (not jail) and then finally processed at about 3:55 PM, where Singh was asked questions about the "murder" investigation. Bunch never asked questions about the newly alleged Welfare Fraud, as the Welfare Fraud charges had nothing to do with real estate, or the murder investigation, or the violation of the insurance code. In any case, Bunch made statements to Singh such as, "*I can go to bat for you if you help with the homicide investigation, and I can get a lot of this dismissed, and you can go on with*

*your life. … Give us Big Daddy[6].*" The questions regarding the murder lasted almost two hours, with no questions being related to the new charges regarding alleged Welfare Fraud. It was clear to Singh that Bunch and Investigators were abusing their investigative powers.

52.     Thereafter, <u>Singh posted bond at about 5:45 PM, but wasn't released until about 10:00 PM.</u> This is the <u>third</u> time that Singh was not released pursuant to the law. This is also the third felony-style arrest of Singh.

53.     After this arrest, Singh inquired with his attorney, seeking answers and an explanation about the charged crimes and seemingly never-ending murder investigation. Singh's attorney was informed that Prosecutor and Defendant David Harris informed Singh's counsel that, "*the only way something can happen is if Singh gives them information against Mr. Carson.*" "*If information against Mr. Carson is provided, then this would all stop.*" Defendant Harris also sated, "*If you say that Carson had something to do with your bail business, then we can make something happen. Give us Big Daddy[7].*" This was all consistent with the constant threats and comments made by Investigators, in particular Bunch. Of note is the common use of the phrase, "Give us Big Daddy," used by both Bunch and Harris. Furthermore, Harris is the senior ranking deputy district attorney, yet has stated that he is personally handling Singh's matters, none of which are high profile cases, nor involve significant crimes relative to others. (e.g. one charge involved a nuanced violation of the Cal. Insurance Code, the other welfare fraud, where he's accused of committing fraud together with his senior and ailing father.)  When Defendants didn't get the information or "confession" they were trying to force out of Singh, they turned their attention yet again to the friends, family members, and business

---

[6] Mr. Bunch refers to Frank Carson as "Big Daddy."

[7] Notably, Mr. Bunch also refers to Frank Carson as "Big Daddy."

related personnel in another attempt to bully and pressure Singh to hand over information.

54.     On or about April 2, 2014, just a week and a half after Mr. Carson made a campaign appearance to a group of licensed private investigators (like Singh), Investigators went to the office of Stewart Title, a title company used by Royal Realty, Karan's brokerage, with the goal that Stewart Title be "*put on notice*" of Singh's murder investigation. Indeed Bunch and Investigators stated as much to Stewart Title personnel. Singh was referred to as a "murderer" to Stewart Title personnel. Bunch and Investigators did this because Investigators discovered that Singh stood to benefit from a pending transaction, and put Stewart Title "on notice" with the goal that it would harm Singh financially if Investigators could convince Stewart Title to drop Royal Realty, Karan, and Singh as customers. To this day, Investigators have failed to provide any information that the real estate transaction had anything to do with the murder investigation.

55.     Investigators are abusing their power and seeking to harm Karan and Singh's financial interests to frustrate their ability to earn a living and pay for any defense.

56.     Stewart Title did in fact stop doing business with Karan and Singh because of the actions of Defendants. This was particularly harmful to the business, especially since the transaction was in the escrow stage, and ready to close soon thereafter. The buyer of the property dropped out, escrow dropped out, and the price of the property dropped as well.

57.     Singh and Karan have suffered emotional distress, stress, anguish, anxiety, and live in fear of their life. They have been directly harmed and defamed by Investigators who have intentionally interfered with their business, and destroyed their reputation among the community, including their close church community.

58.     With deliberate indifference to the rights of Karan and Singh to be free from excessive force and outrageous conduct, Defendants County, Fladagar, and

Harris have ongoingly encouraged, tolerated, ratified, and acquiesced to a dangerous environment of brutality by failing to conduct sufficient training or supervision with respect to the constitutional limitations on the use of force and abuse of power; by failing to adequately punish unconstitutional uses of force; by tolerating the use of unconstitutional force; by ongoingly failing to properly or neutrally investigate citizen complaints of excessive force or abuse; and by tolerating, encouraging, and permitting collusive statements by involved officers in such situations.

59.    It is the longstanding, widespread, and deliberately indifferent custom, habit, practice and/or policy of County, Fladagar, and Harris to permit Investigators to use excessive force, outrageous tactics, and tortuous activity against individuals when such use is unnecessary and unjustified, as well as failing to supervise and to train investigators in the appropriate constitutional limits on the use of force and techniques, knowing that these members of law enforcement therefore pose a significant risk of injury to the public.

60.    The District Attorney's office has been the subject of numerous complaints, all of which appear to be similar to the allegations herein.

61.    Investigators, namely Bunch, have also been the subject of numerous complaints, all which seem to suggest similar tactics and conduct, and the District Attorney's office has done nothing.

62.    The District Attorney's office has been the subject of accusations ranging from bogus investigations motivated by politics, cover-ups involving the trafficking of dangerous military-grade weapons, and deliberate and systematic indifference to the rights of citizens to be free from racism, among others.

63.    In fact, the District Attorney's office has engaged in and encouraged, tolerated, ratified, and acquiesced to the racism of its' Investigators by: failing to conduct sufficient training or supervision with respect to the rights of citizens to be free from racism in law enforcement; by failing to adequately punish race based law enforcement actions; by ongoingly tolerating racism, slurs, and race based selective

law enforcement among the investigative force and in investigative decisions; and by failing to properly investigate citizen complaints of racism, use of racial slurs, racial profiling, race based animus, and toleration of collusive statements by involved investigators in such situations.

**IV.**

**PRESENTATION OF CLAIM**

64.     Defendants, Kirk Bunch, an individual, Frank Navarro, an individual, John Evers, an individual, David Harris, an individual, and Birgit Fladager, an individual, are California individuals sued as such, and in their government employment capacity. The County Of Stanislaus, a government entity, is and at all times herein mentioned was a public entity. On or about July 28, 2014 and October 29, 2014, Plaintiff duly presented a claim for damages sought herein. Said claims were rejected on December 17, 2014, and thereafter, prior to the filing of this Complaint for Damages.

**V.**

**CLAIMS FOR RELIEF**

**CLAIM 1**

**VIOLATION OF 14 U.S.C. 1983**

42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

Plaintiff in this action is a citizen of the United States and all of the individual Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

65.     Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

JS District Court
Eastern District
Civil

66.     At all times relevant, Defendants were acting under color of law.

67.     The acts or omissions of all individual Defendants were moving forces behind Plaintiffs injuries.

68.     These individual Defendants acted in concert and joint action with each other.

69.     The acts or omissions of Defendants as described herein intentionally deprived Plaintiffs of their constitutional and statutory rights and caused them other damages.

70.     Defendants are not entitled to qualified immunity for the complained of conduct.

71.     The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiffs.

72.     As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, Plaintiffs have incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

73.     On information and belief, Plaintiffs may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained injury, in amounts to be ascertained in trial.

74.     Plaintiffs are further entitled to attorneys' fees and costs, pre-judgment interest and costs as allowable by federal or state law. There may also be special damages for lien interests.

75.     In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually

named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

## CLAIM 2 – Unlawful detention
## (AGAINST ALL DEFENDANTS)

76.    Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

77.    Defendants deprived Plaintiff of his property and liberty interests when he was unlawfully arrested and jailed without probable cause. Compounding the issue, Plaintiff was intentionally prevented from posting bail or being released in conformity with the law.

78.    Even after bail was posted, Plaintiff was not timely released.

79.    Plaintiffs liberty interest under the 14th Amendment to the United States Constitution was violated by the aforesaid actions of Defendants and each of them.

## CLAIM 3 – Deliberate Indifference
## (AGAINST ALL DEFENDANTS)

80.    Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

81.    Defendants showed deliberate indifference to the life and liberty of Plaintiff when they intentionally misinformed other gang member inmates housed with Plaintiff, with whom Plaintiff had previous dealings with, that Plaintiff was a snitch, putting Plaintiff in immediate and ongoing danger for his life. Defendants dis this knowing the result of such misinformation.

82.    Compounding the issue, Plaintiff was intentionally prevented from being released in conformity with the law, even after bail was posted by Plaintiff.

83.    Defendants, through the improper training of its officers, maintained at

all relevant times herein, a policy, practice and/or procedure, which resulting in, the unjustified and unlawful housing of Plaintiff designed to put Plaintiff in immediate and ongoing danger.

## CLAIM 4 – Unlawful search and seizure
## (AGAINST ALL DEFENDANTS)

84.     Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

85.     Defendants violated Singh's right to be free of unreasonable search and seizure under the 4th Amendment to the United States Constitution when they maliciously investigated Singh for a murder they knew he did not commit. Defendants arrested Singh without probable cause, and seized his property without probable cause.

86.     Defendants deprived Plaintiff of his property and liberty interests protected by the 4th Amendment to the United States Constitution.

## CLAIM 5 – Racial Discrimination
## in Violation of the Equal Protection Clause of the 14th Amendment and
## 42 U.S.C. § 1981
## (AGAINST ALL DEFENDANTS)

87.     Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

88.     Defendants violated Singh's right to be free from racial discrimination in the law enforcement by Defendants and to enjoy the equal protection of the laws.

89.     Defendants violated Karan's right to be free from racial discrimination in the law enforcement by Defendants and to enjoy the equal protection of the laws.

90.     Defendant's have said actions of which illustrate, prove motive and discriminatory intent.

91.     Carson has represented Indians for years. Singh has known Carson since Singh was a child.

92.     Bunch alleges that Carson represented the Indian Shree Ram Mandir Temple for free, and that he does Indian people favors, and Indian people, "do all of his dirty work."

93.     Furthermore, Bunch stated to Singh that Carson represented Singh and Bunch didn't like this loyalty to "Indians."

94.     Bunch has stated to Plaintiffs, "You guys (Indians) are all the same and sticking together."

95.     Members of the Temple have been approached about Singh and harassed.

96.     At least 100 Indian people have been approached, harassed, discriminated, or interrogated by Defendants, lead by Bunch.

97.     Plaintiffs, as members of a protected class, have a clearly established statutory right under the law to be free from racially motivated arrests, searches, and seizures, and the aforementioned conduct of Defendants. Defendants intentionally treated Plaintiffs differently due to their race, without any rational basis for the difference in treatment.

98.     Plaintiffs race was a motivating factor in the decision to use excessive force, maliciously prosecute Plaintiff, and undertaken with the purpose of depriving Plaintiffs of the equal protection and benefits of the law, equal privileges, and immunities under the law, and due process.

## CLAIM 6

## CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY (18 U.S.C. 1961, et seq. & 18 U.S.C. 1964 (Civil RICO)); (AGAINST ALL DEFENDANTS)

99.     Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of

1  Action in this Complaint, inclusive, as though fully set forth herein.

2      100.  Defendants created, participated and associated each with the other in

3  some organized manner as alleged above.  The acts alleged were (A) The type

4  recognized under the RICO statute; (B) Done and continued in multiple; ( C)

5  Related each to the other; (D) Committed within ten years of each other; and (E)

6  Perpetrated by the same persons and aimed at the same class of victims.  These

7  actions affect interstate commerce; the use of interstate commerce and the use of the

8  internet, the mails and the wire.  The activity continues and the harm continues at

9  time of suit, to wit, as alleged herein.

10      101.  At various times and places partially enumerated in Plaintiff'

11  documentary material, all Defendants did acquire and/or maintain, directly or

12  indirectly, an interest in or control of a RICO enterprise of individuals who were

13  associated in fact and who did engage in, and whose activities did affect, interstate

14  and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and

15  1962(b).

16      102.  Likewise, all Defendants did conduct and/or participate, either directly

17  or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern

18  of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and

19  1962(c).

20      103.  During the ten (10) calendar years preceding March 1, 2003 A.D., all

21  Defendants did cooperate jointly and severally in the commission of two (2) or more

22  of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§

23  1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(b)

24  (Prohibited activities).

25      104.  Plaintiffs further allege that all Defendants did commit two (2) or more

26  of the offenses itemized above in a manner which they calculated and premeditated

27  intentionally to threaten continuity, i.e. a continuing threat of their respective

28  racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(b) supra.

Specifically, the actions in connection to the Athwal matter (referenced herein) and the Attal matter (referenced herein).

105.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to be liberally construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.

106.    Respondeat superior (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

107.    The acts or omissions of all individual Defendants were moving forces behind Plaintiffs injuries.

108.    These individual Defendants acted in concert and joint action with each other.

109.    The acts or omissions of Defendants as described herein intentionally deprived Plaintiffs of their constitutional and statutory rights and caused them other damages.

110.    Defendants are not entitled to qualified immunity for the complained of conduct.

111.    The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiffs.

112.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendants' unlawful conduct, Plaintiffs have incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

113.    On information and belief, Plaintiffs may suffer lost future earnings and impaired earnings capacities from the not yet fully ascertained injury, in amounts to

be ascertained in trial. Plaintiffs are further entitled to attorneys' fees and costs, pre-judgment interest and costs as allowable by federal or state law. There may also be special damages for lien interests.

114.   In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

**CLAIM 7**

**DEFAMATION**

**Libel, Libel Per Se, Slander, Slander Per Se**

**(Civil Code §§ 43, 44, 45, 45a, 46.  C.C.P. § 460)**

**(AGAINST ALL DEFENDANTS)**

115.   Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

(Applicable to all defamation counts)

116.   Orally and in writing Defendants Bunch and Investigators wrongfully and falsely charged and accused Plaintiffs with committing crimes; frauds upon the courts, forgery, wrongfully and falsely accused Plaintiffs of committing crimes which they did not commit, and made other wrongful and false statements; all of which exposed Plaintiffs to contempt and ridicule.

117.   Specifically, Bunch has stated that Singh is a murderer, pimp, runs a prostitution ring, a fraud, and does "dirty work" for Carson, as mentioned above.

118.   Moreover, Investigators have stated that Singh is a murderer, pimp, runs a prostitution ring, is a fraud, and as mentioned above.

119.   Said published statements included Defendants publication of said statements to friends, families, and business associates of Plaintiffs, wherein

Defendants falsely charged Plaintiff with being a murderer, felon, criminal, supra.

120.　These statements were false, defamatory, misleading and malicious.

121.　These statements were of and concerning Plaintiffs, and made with direct reference of Plaintiffs actual legal and business identities.

122.　The said false statements and publications were made publicly, in a public forum and filed in public records.　The said oral publications were heard by numerous people known and unknown to Plaintiffs.　The words and writings were understood by those who saw and heard them in a way that defamed the Plaintiffs.

(Libel, Libel Per Se)

123.　The Defendants made, implied or imputed a series of continuing false, or materially false portions, of unprivileged publications, comments, opinions, criticisms, colloquium, about the Plaintiffs which exposed Plaintiffs to hatred, contempt, ridicule, or obloquy, caused Plaintiffs to be shunned or avoided and that injured Plaintiffs in their occupations.

124.　Specifically, Bunch has stated that Singh is a murderer, pimp, runs a prostitution ring, a fraud, and does "dirty work" for Carson, as mentioned above.

125.　Moreover, Investigators have stated that Singh is a murderer, pimp, runs a prostitution ring, is a fraud, and as mentioned above.

126.　Defendants false publications included publications which were defamatory without the necessity of explanatory matter, or extrinsic facts.

(Slander, Slander Per Se)

127.　Defendants made, implied or imputed a series of continuing false, or materially false portions of unprivileged publications, comments, opinions, criticisms, colloquium, orally uttered, whereby they stated, imputed or implied or charged plaintiff with a crime, fraud, or having been indicted, convicted or punished for a crime of fraud upon the court, and also made publications which tended to injure Plaintiffs in respect to their profession, trade or business.

128.　Defendants false publications carried a meaning on their face and by

innuendo and inducement which made them slanderous.

(Damage Allegations Applicable to Both Libel and Slander)

129.   As a proximate result of the above described publications, Plaintiffs have suffered loss of reputation, shame, mortification, and hurt feelings all to their damage.

130.   As a proximate result of the above described publications, Plaintiffs have suffered special damages including, but not limited to, attorneys fees, loss of business income, and future income, costs and expenses of litigation and further special damages according to proof at the time of trial.

131.   The above-described publications were published by the Defendants with malice, fraud or oppression, or in reckless disregard for the Plaintiffs rights, and Defendants acts were willful, wanton and malicious, such as to justify an award of punitive and exemplary damages for the sake of example and as punishment.

## CLAIM 8

## TORTIOUS INTERFERENCE WITH CONTRACT
## (AGAINST ALL DEFENDANTS)

132.   Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

133.   At all pertinent times herein mentioned, as above-alleged, Plaintiffs had valid and existing contractual relationships with buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions.

134.   Plaintiffs pending transaction consisted of a purchase contract with a seller and buyer of real property, the brokerage and listing agreement related thereto, and a contract with Stewart Title for escrow and title services was a part of said transaction.

135.   Plaintiffs are informed and believe, and thereon allege, that Defendants knew that Plaintiffs had existing contractual relationships with buyers, sellers, title

and escrow companies, with which Plaintiffs conducted real estate transactions.

136. That, despite such knowledge Defendants aided and abetted each other, encouraged and assisted each other to force buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions, to withdraw from representing Plaintiffs on said matters by, inter alia, by:

    a. Encouraging buyers, sellers, title and escrow companies, with which Plaintiff Singh conducted real estate transactions to withdraw from all of Plaintiffs real estate dealings, both existing at the time, and new, by intimidation, and misinformation;

    b. Encouraging buyers, sellers, title and escrow companies, with which Plaintiff Karan conducted real estate transactions to withdraw from all of Plaintiffs real estate dealings, both existing at the time, and new, by intimidation, and misinformation;

137. As a direct and proximate result of the Defendants intentional acts, as more fully described herein above, the business and contractual relationships between Plaintiffs and buyers, sellers, title and escrow companies have been disrupted.

138. As a proximate result of the Defendants intentional interference with contractual relationships, Plaintiffs have suffered substantial compensable losses, the exact nature and extent of which are not yet fully ascertained, proof of which will be offered at time of trial.

139. The aforementioned acts of Defendants, and each of them, were intended to injure Plaintiffs, and were in conscious disregard of the rights of Plaintiffs, and were undertaken with the knowledge of probable injury to Plaintiffs interests, and were therefore willful, oppressive, and wanton, and undertaken with malice, and constitute despicable conduct. Therefore, Plaintiffs are entitled to punitive and exemplary damages, according to proof at time of trial.

/ / /

# CLAIM 9

## NEGLIGENT INTERFERENCE WITH CONTRACT
## (AGAINST ALL DEFENDANTS)

140.    Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

141.    At all pertinent times herein mentioned, as above-alleged, Plaintiffs had valid and existing contractual relationships with buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions.

142.    Plaintiffs are informed and believe, and thereon allege, that Defendants knew that Plaintiffs had existing contractual relationships with buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions.

143.    That, despite such knowledge, Defendants, intentionally or negligently aided and abetted each other, encouraged and assisted each other to force buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions, to withdraw from representing Plaintiffs on said matters by, inter alia, by:

    a.  Encouraging buyers, sellers, title and escrow companies, with which Plaintiff Singh conducted real estate transactions to withdraw from all of Plaintiffs real estate dealings, both existing at the time, and new, by intimidation, and misinformation;

    b.  Encouraging buyers, sellers, title and escrow companies, with which Plaintiff Karan conducted real estate transactions to withdraw from all of Plaintiffs real estate dealings, both existing at the time, and new, by intimidation, and misinformation;

144.    As a direct and proximate result of the Defendants intentional acts, as more fully described herein above, the business and contractual relationships between Plaintiffs and buyers, sellers, title and escrow companies have been disrupted.

145.   As a proximate result of the Defendants intentional interference with contractual relationships, Plaintiffs have suffered substantial compensable losses, the exact nature and extent of which are not yet fully ascertained, proof of which will be offered at time of trial.

146.   The aforementioned acts of Defendants, and each of them, were intended to injure Plaintiffs, and were in conscious disregard of the rights of Plaintiffs, and were undertaken with the knowledge of probable injury to Plaintiffs interests, and were therefore willful, oppressive, and wanton, and undertaken with malice, and constitute despicable conduct.  Therefore, Plaintiffs are entitled to punitive and exemplary damages, according to proof at time of trial.

## CLAIM 10

## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE
## (AGAINST ALL DEFENDANTS)

147.   Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

148.   Defendants, and each of them, knew of Plaintiffs ongoing business and business relationships with buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions, and knew of Plaintiffs other prospective business.

149.   Defendants intentionally interfered with Plaintiffs known economic prospect and acted in a manner that disrupted any potential Plaintiffs had in pursuing said prospects.

150.   Defendants knew of Plaintiffs future economic benefit of using Steward Title for real estate transactions.

151.   Defendants knew of said relationship and indeed entered into the office of said third party with the goal of interfering.

152.   Defendants acts of stating Singh is a murderer were designed to disrupt the relationship.

153.   A reasonable probability of future economic benefit was present in that Plaintiffs operated a real estate business directly in need of the services and benefits of a title/escrow business.

154.   Through Defendant's actions, Defendants, and each of them, intentionally interfered with Plaintiffs prospective economic advantage from ongoing relationships with business associates and businesses throughout the United States.  As a direct result of defendants' actions and omissions, Plaintiffs have been damaged in an amount according to proof.

155.   Defendants' actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of plaintiff, and, therefore, plaintiff is entitled to an award of exemplary and punitive damages against defendants, and each of them, in an amount according to proof.

156.   The aforementioned acts of Defendants, and each of them, were intended to injure Plaintiffs, and were in conscious disregard of the rights of Plaintiffs, and were undertaken with the knowledge of probable injury to Plaintiffs interests, and were therefore willful, oppressive, and wanton, and undertaken with malice, and constitute despicable conduct.  Therefore, Plaintiffs are entitled to punitive and exemplary damages, according to proof at time of trial.

## CLAIM 11

## NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE
## (AGAINST ALL DEFENDANTS)

157.   Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

158.   Defendants, and each of them, knew of Plaintiffs ongoing business and business relationships with buyers, sellers, title and escrow companies, with which Plaintiffs conducted real estate transactions, and knew of Plaintiffs other prospective business.

159.   Defendants negligently interfered with Plaintiffs known economic prospect and acted in a manner that disrupted any potential Plaintiffs had in pursuing said prospects.

160.   Defendants knew or should have known of Plaintiffs future economic benefit of using Steward Title for real estate transactions.

161.   Defendants knew or should have known of said relationship and indeed entered into the office of said third party with the goal of interfering.

162.   Defendants knew or should have known their acts of stating Singh is a murderer were likely to disrupt the relationship.

163.   A reasonable probability of future economic benefit was present in that Plaintiffs operated a real estate business directly in need of the services and benefits of a title/escrow business.

164.   Through Defendant's actions, Defendants, and each of them, intentionally interfered with Plaintiffs prospective economic advantage from ongoing relationships with business associates and businesses throughout the United States.  As a direct result of defendants' actions and omissions, Plaintiffs have been damaged in an amount according to proof.

165.   Defendants' actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of plaintiff, and, therefore, plaintiff is entitled to an award of exemplary and punitive damages against defendants, and each of them, in an amount according to proof.

166.   The aforementioned acts of Defendants, and each of them, were intended to injure Plaintiffs, and were in conscious disregard of the rights of Plaintiffs, and were undertaken with the knowledge of probable injury to Plaintiffs interests, and were therefore willful, oppressive, and wanton, and undertaken with malice, and constitute despicable conduct.  Therefore, Plaintiffs are entitled to punitive and exemplary damages, according to proof at time of trial.

/ / /

# CLAIM 12

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ALL DEFENDANTS)

167.    Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

168.    Plaintiffs are informed and believe and allege thereon that Defendants, by and through its principals, agents and employees conducted themselves unlawfully in violation of public policy and applicable law as described above with conscious disregard of the result or outcome of such act. The unlawful harassment, retaliation, deprivation of rights, and conduct towards Plaintiffs, due to Defendants improper motivations and surrounding circumstances constitute extreme and outrageous conduct by the Defendants, and each of them.

169.    Through the outrageous conduct described above, Defendants acted with the intent to cause, and with reckless disregard for the probability of causing Plaintiffs to suffer severe emotional distress.

170.    At all relevant times, Defendants had actual or constructive knowledge of extreme and outrageous conduct described herein, and condoned, ratified and participated in such extreme and outrageous acts.

171.    Defendants had special knowledge of the susceptibility of Plaintiffs to emotional distress.

172.    As a direct and proximate result of Defendants willful, knowing and intentional acts and Defendants failure to act, Plaintiffs have suffered and will continue to suffer mental distress and anguish, and loss of consortium. Plaintiffs have suffered and will continue to suffer a loss of earnings, and other employment benefits and job opportunities, and relationships. Plaintiffs are hereby entitled to general and compensatory damages in the amount to be proven at trial.

173.    The acts of Defendants, as alleged herein, were done with fraud,

JS District Court
Eastern District
Civil

oppression and malice, with a conscious disregard for Plaintiffs rights, and with the intent, design and purpose of injuring Plaintiffs, with an improper and evil motive amounting to malice, in conscious disregard of Plaintiffs rights. Plaintiffs are therefore entitled to recover punitive damages against Defendants.

## CLAIM 13

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST ALL DEFENDANTS)

174.    Plaintiffs re-allege and reincorporate each and every allegation contained in all previous paragraphs of all previous sections, Claims, and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

175.    Plaintiffs are informed and believe and allege thereon that Defendants, by and through its principals, agents and employees conducted themselves unlawfully in violation of public policy and applicable law as described above with conscious disregard of the result or outcome of such act. The unlawful harassment, retaliation, deprivation of rights, and conduct towards Plaintiffs, due to Defendants improper motivations and surrounding circumstances constitute extreme and outrageous conduct by the Defendants, and each of them.

176.    Through the outrageous conduct described above, Defendants acted with the intent to cause, and with reckless disregard for the probability of causing Plaintiffs to suffer severe emotional distress.

177.    Defendants have a duty to act as a reasonable person would under the same or similar circumstances.

178.    At all relevant times, Defendants had actual or constructive knowledge of extreme and outrageous conduct described herein, and condoned, ratified and participated in such extreme and outrageous acts.

179.    Defendants had special knowledge of the susceptibility of Plaintiffs to emotional distress.

/ / /

180.   As a direct and proximate result of Defendants willful, knowing and intentional acts and Defendants failure to act, Plaintiffs have suffered and will continue to suffer mental distress and anguish, and loss of consortium. Plaintiffs have suffered and will continue to suffer a loss of earnings, and other employment benefits and job opportunities, and relationships. Plaintiffs are hereby entitled to general and compensatory damages in the amount to be proven at trial.

181.   The acts of Defendants, as alleged herein, were done with fraud, oppression and malice, with a conscious disregard for Plaintiffs rights, and with the intent, design and purpose of injuring Plaintiffs, with an improper and evil motive amounting to malice, in conscious disregard of Plaintiffs rights. Plaintiffs are therefore entitled to recover punitive damages against Defendants.

# VI.
## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs each respectfully pray for and request a trial by jury, and a resulting judgment to include the following relief (and any further relief which the Court may find to be justified by the evidence and by a jury's verdict):

A.   Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.   Economic losses on all claims allowed by law;

C.   Special damages in an amount to be determined at trial;

D.   Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

E.   Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F.   Pre- and post-judgment interest at the lawful rate; and,

JS District Court
Eastern District
Civil

G.    Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## **PLAINTIFFS REQUEST A TRIAL BY JURY.**

Respectfully submitted this 21ST day of January, 2016.

/s/    *Alejandro Herrera*
Alejandro Herrera, Esq.
California Bar No. 284712
Email: alex@hessherrera.com
233 Wilshire Blvd., Suite 400
Santa Monica, CA 90401
Tel:   213-545-1660
Fax:  213-232-7555

# **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of January 2016, a true and correct copy of the foregoing has been served electronically upon all registered CM/ECF users in this case.

/s/     *Alejandro Herrera*
Alejandro Herrera, Esq.
California Bar No. 284712
Email: alex@hessherrera.com
233 Wilshire Blvd., Suite 400
Santa Monica, CA 90401
Tel:   213-545-1660
Fax:   213-232-7555

JS District Court
Eastern District
Civil